UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Complaint of
ESSENCE MARINE HOLDINGS LTD., as
Owner of the Yacht Essence, for
Exoneration from or Limitation of Liability.

**MEMORANDUM & ORDER**

---

Daniel Bortolotti and Marjorie Havice as
Co-administrators of the Estate of Gina
Bortolotti, and Individually,

        Claimants and
        Third Party Plaintiffs,

James H. Mahlmann, United New York
Sandy Hook Pilots' Association, and
Quintess, LLC,

        Third-Party Defendants.

06 Civ. 8154 (LBS)

---

This case arises out of the 2006 collision in the Long Island Sound between the sailing yacht *Essence*, owned by Essence Marine Holdings Ltd. ("Essence Marine"), and the bulk carrier *Barkald*, owned by T. Klaveness Shipping AS and operated by Klaveness Maritime Logistics AS (collectively, the "Klaveness Defendants"). As a result of the collision, the *Essence* sank and became a total loss. *Essence* crew member Gina Bortolotti died in the aftermath of the collision. Essence Marine subsequently commenced this action seeking exoneration from or limitation of liability for all damages arising out of the collision. Daniel Bortolotti and Marjorie Havice, individually and as co-administrators of the estate of their daughter Gina Bortolotti (collectively, the "Bortolottis"), filed claims against Essence Marine seeking wrongful death and survival damages. The Bortolottis also filed cross-claims for wrongful death and survival damages

1

against the Klaveness Defendants and Nardus Bothma, the mate on watch on the *Essence* at the time of the collision.[1]

The present dispute relates to settlement negotiations in the case. In November 2008, the Bortolottis settled their claims against all defending parties for five million dollars. Two of the five million was to be paid by or on behalf of Essence Marine, Quintess, LLC—an entity that was permitted to use the *Essence*—and Bothma (collectively, the "Essence interests").[2] Three million was to be paid by or on behalf of the Klaveness Defendants, James H. Mahlmann (the pilot on board the *Barkald* at the time of the collision), and the United New York Sandy Hook Pilots' Association, of which Mahlmann was a member. The Klaveness Defendants now bring a motion for partial summary judgment, in which Mahlmann joins, seeking contribution from Bothma for the $3 million that was paid on their behalf toward the settlement of the Bortolottis' claims. Bothma, in his capacity as a defending party with respect to the Bortolottis' claims, cross-moves for partial summary judgment. In his motion, Bothma seeks a declaration that the Klaveness Defendants are not permitted to seek contribution from him. For the reasons stated below, the Court denies both motions for partial summary judgment.

**I.     Background**

In early September 2008, counsel for the parties participated in a private mediation in an attempt to resolve all claims relating to the 2006 collision. No claims were settled through that mediation, but the parties subsequently exchanged a series of email messages exploring

---

[1] The Bortolottis also filed a third-party complaint against the United New York Sandy Hook Pilots' Association and Quintess, LLC, seeking the same wrongful death, survival, and punitive damages that they seek from Essence Marine, the Klaveness Defendants, and Bothma. Bothma also asserted affirmative claims for relief against the Klaveness Defendants and Mahlmann, seeking collision damages for his lost personal property, lost wages, and emotional distress. In turn, the Klaveness Defendants cross-claimed against Bothma seeking, inter alia, contribution and indemnity.

[2] With respect to the Bortolottis' claims, Bothma is a defending party aligned with the Essence interests because he was a mate on the *Essence*. It is in this capacity that Bothma brings the present cross-motion for summary judgment. Bothma's affirmative claims are not directly at issue in the present motions.

settlement of the Bortolottis' claims.  The settlement agreement was not reduced to a formal writing, but was embodied in a series of email messages exchanged among counsel.  These email exchanges also form the basis of the parties' disagreement over whether the settlement intended to prohibit subsequent actions for contribution between the defending parties.

In an email message from Richard Stone, counsel for the Essence interests, to Patrick Lennon, counsel for the Klaveness Defendants, Stone indicated that his clients' insurer would contribute toward a "global settlement (i.e., one where all defending interests are released by the parents and the Estate) up to a maximum contribution of $1 million."  (Ex. 1 to Lennon Aff., Email from Richard Stone to Patrick F. Lennon, Oct. 21, 2008.)  In his declaration to the Court, Stone asserts that his parenthetical comment after the words "global settlement" was not intended to define or limit that term, but rather, to clarify the Essence insurer's position that the settlement must resolve the Bortolottis' claims against all defending parties, including Malhmann and the pilots' association, and not just against the Klaveness Defendants and Essence Defendants.  (Second Decl. of Richard W. Stone ¶¶ 23–26.)

Negotiations continued because the Bortolottis were not willing to settle for the amount initially offered by the defending parties.  In a later email message to Lennon, Stone conveyed that the insurer had offered to increase its contribution from $1 million to $2 million toward "a global settlement of all of the claims asserted by the parents and the Estate."  (Ex. 2 to Lennon Aff., Email from Richard Stone to Patrick F. Lennon, Nov. 13, 2008.)  In communicating the defending parties' settlement position to Joel Faxon, counsel for the Bortolottis, Lennon stated in an email message that the settlement is for "the claims of the Parents and the Estate as against all defendants for $5 million."  (Ex. 3 to Lennon Aff., Email from Patrick Lennon to Joel Faxon, Nov. 14, 2008.)  Subsequently, in a follow-up email from Lennon to Faxon, Lennon relates a

discussion he had with Stone that a stipulation of dismissal should include "all claims, cross claims, etc. relating to your clients." (Ex. 16 to Second Decl. of Richard W. Stone, Email from Patrick F. Lennon to Joel Faxon, Nov. 17, 2008).

Also relevant to this dispute is the draft stipulation circulated by counsel for the Essence interests, which states that the settlement would voluntarily dismiss the "Bortolotti Actions together with every . . . claim, cross-claim and counterclaim by a party against any other party that relates to the Bortolotti Actions." (Ex. 4 to Lennon Aff., Draft Stipulation.) The stipulation also provides that "the dismissal of the Bortolotti Actions . . . does not include the dismissal of the claims of Bothma against Klaveness and Mahlmann seeking damages or the cross-claims and counterclaims related thereto, nor does it include dismissal of any equitable defense against such claims available to Klaveness including recoupment and setoff, all of which are reserved." (Ex. 4 to Lennon Aff., Draft Stipulation.)

**II.     Standard**

Summary judgment is appropriate when the pleadings and the record show that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is material when it might affect the outcome of the suit under governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could have returned a verdict for the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). When ruling upon cross-motions for summary judgment, the Court must evaluate each motion separately and must draw all reasonable inferences against the party whose motion is under consideration. *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003).

The settlement agreement at issue is embodied in a series of email exchanges among counsel. Under general maritime law, contracts do not need to be reduced to formal writing in order to be enforceable. *Kossick v. United Fruit Co.*, 365 U.S. 731, 734–35 (1961). Because a settlement agreement is a contract, its interpretation and enforcement is governed by general contract principles. *See Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). As such, a motion for summary judgment "may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (citation omitted). Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person" who has examined the agreement in light of the customs and terminology generally understood in the trade. *Id.* Where contract language is ambiguous, the court may look to extrinsic evidence to determine the parties' intent. However, such reference to extrinsic evidence of intent may raise questions of material fact which preclude summary judgment. *See Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990).

**III.    Analysis**

In resolving the cross-motions for partial summary judgment, the Court considers two questions: (1) whether contribution from settling defendants is barred as a matter of controlling case law, and if not, (2) whether the term "global settlement" indicated that all claims arising out of the Bortolottis' action would be dismissed, or only that the Bortolottis' direct claims would be dismissed, leaving open the related contribution claims. Because we find that (1) contribution is not barred as a matter of law, and (2) there are genuine issues of material fact as to whether the

parties intended for the settlement to preclude contribution actions, we deny both motions for partial summary judgment.

### A. Contribution is not barred as a matter of law

First, we deny summary judgment because contrary to Bothma's assertions, the dispute before the Court is not over a pure question of law. Contribution is not, as Bothma contends, barred by the controlling case law. In *McDermott* and its companion case *Boca Grande*, the Supreme Court established a proportionate liability scheme and barred contribution actions by nonsettling tortfeasors against settling tortfeasors. *McDermott, Inc. v. Amclyde*, 511 U.S. 202 (1994); *Boca Grande Club, Inc. v. Fla. Power & Light Co.*, 511 U.S. 222 (1994). Similarly, courts have held that a settling tortfeasor cannot seek contribution from a nonsettling tortfeasor. *McDermott*, 511 U.S. at 212 n.13; *Murphy v. Fla. Keys Elec. Coop. Ass'n, Inc.*, 329 F.3d 1311, 1313 (11th Cir. 2003). However, the Court finds that the holdings of *McDermott* and *Boca Grande* are limited to the question of contribution between nonsettling and settling tortfeasors. Under the proportionate share approach established in *McDermott*, when one defendant does not settle and the amount of damages and the percentage of each defendant's liability are determined at trial, the nonsettling defendant is responsible only for the proportion of the total damages attributed to it in the verdict. 511 U.S. at 208–10.

*McDermott* does not permit contribution because under the proportionate share approach to the payment of damages, a nonsettling defendant does not risk paying more than his equitable share of the judgment. This stands in contrast to the *pro tanto* alternative approach considered by the Supreme Court, which credits the nonsettling defendant for the amount paid by the settling defendant. Under a *pro tanto* approach, a nonsettling defendant's liability will often differ from its equitable share because a meager settlement will require the nonsettling defendant

6

to pay more than its share, whereas, a generous settlement will result in a "windfall" reduction in damages paid by the nonsettling defendant. *Id.* at 212, 221. Thus, in establishing the proportionate share approach for calculation of damages for nonsettling defendants, the Supreme Court reasoned that "no suits for contribution from the settling defendants are permitted, nor are they necessary." *Id.* at 209.

The *McDermott* analysis does not apply to the situation at bar because all of the defending parties have settled with the Bortolottis and the settlement did not set forth an apportionment of fault. Unlike in *McDermott*, in this case one settling party is seeking contribution from another settling party, instead of from a nonsettling party. Furthermore, *McDermott* prohibited contribution claims because a nonsettling defendant under a proportionate share approach is not paying more than his fair share according to a jury's apportionment of fault. Because the settlement in this case did not indicate an apportionment of liability, the rationale behind *McDermott*'s prohibition of contribution does not apply.

Moreover, the Court does not interpret *McDermott* as eliminating entirely the "well-established maritime rule allowing contribution between joint tortfeasors." *Cooper Stevedoring Co. v. Kopke*, 417 U.S. 106, 112 (1974). Thus, contrary to Bothma's assertions, contribution claims between the settling parties in this case is not barred by controlling case law. Instead, to resolve the motions the Court looks to the email messages and related documents that together compose the settlement agreement, to ascertain whether the settlement prohibited contribution claims.

### B. Ambiguity in settlement agreement language

In evaluating the settlement documents, the Court finds that partial summary judgment is inappropriate because genuine issues of material fact exist as to whether the settlement

7

extinguished contribution actions.  Contrary to the parties' assertions, the email exchanges among counsel do not conclusively indicate the parties' intent either to preserve or to extinguish contribution actions between the defending parties.  "Global settlement," the key term that emerged from the settlement negotiations, is inconsistently defined throughout the various email messages.  As set forth above, Bothma's attorney defined "global settlement" in one email message as a settlement in which "all defending interests are released by the parents and the Estate."  (Ex. 1 to Lennon Aff., Email from Richard Stone to Patrick F. Lennon, Oct. 21, 2008.)  Bothma contends, based on the phrase "all defending interests," that the settlement voluntarily dismissed direct claims by the Bortolottis as well as related follow-on claims for contribution or indemnity.  (Mem. of Law Supp. Mot. Partial Summary Judgment, at 4 n.3.)  Bothma's broad, inclusive interpretation of "global settlement" is bolstered by an email from the Klaveness Defendants' counsel to the Bortolottis' counsel, which stated that the settlement would dismiss all claims and cross-claims "relating to" the Bortolottis' action.  (Ex. 16 to Second Decl. of Richard W. Stone, Email from Patrick F. Lennon to Joel Faxon, Nov. 17, 2008)

     However, subsequent email exchanges create ambiguity as to whether the "global settlement" term is so broad as to prohibit actions for contribution.  A later email message from Stone sought a "global settlement of all of the claims asserted by the parents and the Estate." (Ex. 2 to Lennon Aff., Email from Richard Stone to Patrick F. Lennon, Nov. 13, 2008.)  The language of the November 13, 2008 email message leaves open the possibility of contribution claims between the settling parties, because those contribution claims would not be claims "asserted by the parents and the Estate."  This narrower reading of the "global settlement" language is consistent with the Klaveness Defendants' assertion that, when initial mediation efforts were unsuccessful, the defending parties agreed to first resolve the Bortolottis' claims

relating to the death of their daughter, and to subsequently address the cross-claims between the Klaveness Defendants and the Essence interests. (Lennon Aff. ¶ 6.) The contrast between the phrasing "all defending interests" in one email message and claims "asserted by the parents" in the later email message, presents a genuine issue of material fact.

A further indication of ambiguity in the settlement is the draft stipulation circulated by counsel for the Essence interests, which is internally inconsistent as to the scope of dismissal of the claims. The second paragraph of the stipulation provides for dismissal of the "Bortolotti Actions together with every . . . claim, cross-claim and counterclaim by a party against any other party that relates to the Bortolotti Actions." (Ex. 4 to Lennon Aff., Draft Stipulation.) However, the third paragraph states that the dismissal of the Bortolottis' claims "does not include dismissal of the claims of Bothma against Klaveness and Mahlmann seeking damages . . . nor does it include dismissal of any equitable defense against such claims available to Klaveness including recoupment and setoff." (Ex. 4 to Lennon Aff., Draft Stipulation.) While the second paragraph can be read broadly to include all claims for contribution, the third paragraph appears to reserve cross-claims and counterclaims for contribution between some of the defending parties.

Finally, the Court notes that the term "global settlement" is susceptible of different interpretations by persons familiar with maritime industry's custom and practice. *See Am. Home Assurance Co.*, 446 F.3d at 316. Stone and Lennon both represent to the Court that they have extensive experience in admiralty and maritime practice. Stone states that in industry usage, the term "global settlement" signifies that all aspects of the claims will be dismissed, including direct claims asserted against each defending party as well as related derivative claims between defending parties seeking contribution. (Second Decl. of Richard W. Stone ¶ 22.) In contrast, Lennon states that "global settlement" does not have any special meaning or definition and is

9

subject to definition by parties engaged in negotiation. (Second Aff. in Supp. Klaveness' Cross Motion ¶ 5.)

As there are issues of material fact with regard to the settlement's scope, summary judgment for either party is inappropriate.

## IV. Conclusion

For the foregoing reasons, partial summary judgment is denied as to both motions. The parties are instructed to submit, within two weeks of this order, their recommendations to the Court as to the timing and sequence of further proceedings in this case. If the parties wish, the Court will refer the parties to the magistrate judge to assist with the resolution of the dispute.

So ordered.

Date: June 3, 2009
New York, New York

_____
Leonard B. Sand
U.S.D.J.